OPINION OF THE COURT
Joseph S. Mattina, S.
This casé, and an analogous matter decided on the same day, raise troubling questions about the use of preprinted or form living trusts, which are now being heavily marketed in New York State. The instant case is especially disturbing because its trust takes the form of loose pages contained in a three-ring binder. The proceeding was initiated by the petition of Anthony Campagna (hereinafter the petitioner) for the probate of the will of Harold Pozarny, who died on September 9, 1996. The decedent’s will, executed April 30, 1996, leaves his entire estate to the “Harold Pozarny Revocable Living Trust dated April 30, 1996 and any amendments thereto.” The trust agreement provides for lifetime income and principal payments to the decedent as he directs. Upon the decedent’s death the principal remaining is to be distributed to the petitioner, a friend. An alleged amendment leaves 99.75% of the principal balance to the petitioner and .25% to Marvin Raskin, another friend. The decedent is the sole lifetime trustee. The petitioner is either sole personal representative under the will and sole successor trustee under the trust, or a cofiduciary in each. A prior will, dated October 24, 1990, which bequeathed .1% of the estate outright to Mr. Raskin and the balance to the *755 petitioner, was also filed with the court. The decedent left assets of about $1 million, of which approximately $950,000 had been transferred into the trust and passes according to its terms and $60,000 remained in his name at death and passes according to the provisions of the will.
In reviewing the probate submissions, the court discovered that both the will and the trust were so ambiguously worded that it was impossible to determine the decedent’s wishes regarding one of the most fundamental elements of his estate plan — the nomination of the fiduciary. Further examination of the documents revealed a staggering number of additional ambiguities, inconsistencies, apparent irrelevancies, and outright errors, many of which pose major problems in ascertaining or effectuating the decedent’s dispositive intent.
At this same time, another construction proceeding involving a form living trust, which contained provisions analogous to those in the document already under review, was brought before the court. The executor of the will of John Howard, concerned that the merger of legal and equitable interests in her father’s trust might render it ineffective and hence not a proper receptacle for the pour-over of his estate assets, sought a construction permitting all of the property to be disposed of according to the trust’s terms. Faced with the Howard request for construction of similar provisions, as well as with the immediate need in the instant case to identify the fiduciary and to ascertain the decedent’s intentions. regarding other significant provisions of both instruments, this court determined that a construction of the instant will and trust was necessary at the present time. The Surrogate’s Court has the power to construe a will when construction is necessary to determine questions in a proceeding before it or to make a complete disposition of a matter (SCPA 201 [3]; see also, Matter of Ross, 96 Misc 2d 463 [1978]). Because one major obscurity concerning the ultimate disposition of the probate estate in the instant matter involved minors or unborns as possible takers, a guardian ad litem was appointed.
On the return date of the citation for probate and construction of the will and trust, the decedent’s intestate distributees, five nieces and nephews (hereinafter the respondents), appeared by counsel. The respondents maintained that the merger of legal and equitable interests rendered the trust ineffective, but they did not challenge the validity of the will. Additionally, they argued against any construction upholding the pour-over of the estate into the trust or, alternatively, *756 incorporating the trust into the will by reference. They sought an interpretation of both instruments that would distribute all of the decedent’s property to them under the will but by intestacy. Marvin Raskin also appeared but raised no objections. After hearing the oral arguments of the parties and requesting written memoranda, this court reserved decision.
The trust agreement in question consists of 42 pages, each page having three holes in the left margin, contained in a three-ring looseleaf binder, entitled “Estate Planning Portfolio”. The two-inch-thick binder contains numerous other documents, including a “Certificate of Trust”; various informational pages describing the trust; a copy of the pour-over will; an “Affidavit of Trust”; a duplicate trust, also signed, but lacking the dispositive sections; a living will; a 20-page property power of attorney; a health care power of attorney; and, in a pocket of the binder, an audiotape describing a husband-wife estate plan (although the decedent was unmarried). All pages are easily removable by opening the binder’s rings. The April 30 will is printed on the same orange paper stock as the trust, but its pages are stapled together at the top. All documents prominently bear the copyright of the attorney-draftsman.
The estate planning package containing the living trust and pour-over will is an example of a product being heavily promoted throughout New York State, in newspaper advertisements and free seminar programs. In many cases, those marketing the documents, attorneys and enterprising laymen alike, have themselves purchased the forms (or a computer program containing them) from an “estate planning institute” headquartered out of State, through a franchise or other arrangement. In some instances, such franchise agreements also afford the marketer “technical assistance” in the use of the various forms. One of the dangers of such a system, which the instant case points up, is that it leads participant franchisees, who may have little if any experience in sophisticated estate and tax planning, to consider themselves competent to “draft” complex instruments and purvey them on a large scale. In the matter before us, as the guardian ad litem reports to the court, such “drafting” appears no more than piecing together various sections from the forms, often in a seemingly feckless, haphazard manner.
Indeed, this will and trust agreement collectively represent the most egregious example of maladroit “drafting” this court has encountered. More than a dozen problems involving inconsistencies, obscurities, and outright errors have been *757 brought to the court’s attention. In her preliminary report, the guardian ad litem has identified and enumerated the most serious of these, which include the difficulty of determining the fiduciary under both instruments; the merger of the trust’s legal and beneficial interests and the possible inefficacy of the trust itself; the invalidity of an amendment to the trust, which involved the removal from, and insertion into, the looseleaf binder of unsigned and unacknowledged pages; the possible failure of the pour-over from the will to the trust and, concomitantly, of the attempt to incorporate the trust by reference into the will; and the questionable effect of the attempted exclusion of the respondents from a share in both the estate and trust.
In addition, as the guardian notes, the trust sections describing the disposition of assets upon the settlor’s death seem to direct, on the one hand, a further trust and, on the other, outright distribution. Finally, she points out that both instruments are replete with inconsistencies (for instance, article one, § 6 of the will directly follows section 2, the will’s page numbers do not conform to its table of contents, article four of the trust provides for distributions to lineal descendants, of which the will declares the decedent has none), irrelevancies (articles six and seven of the trust are entirely unnecessary), and outright errors (article one, § 6 of the will references this trust agreement and an article twelve not even found in the will, which contains only five articles; several consecutive pages of the trust have the same page numbers) that cumulatively create confusion and doubt about the decedent’s intent and raise concern about possible tampering.
The guardian argues that because the many problematic provisions of both instruments obfuscate the decedent’s meaning and frustrate his purpose, assistance from the court is required to ascertain his intention. We agree. We also determine that, for reasons of judicial economy, the construction of questionable sections of both instruments essential to the administration and disposition of the decedent’s assets should be undertaken now, at the time of the admission of the will to probate.
It is well established that in a construction proceeding, a court must ascertain the intent of the testator (Matter of Jones, 38 NY2d 189 [1975]) and that it must glean such intent, “not from a single word or phrase but from a sympathetic reading of the will as an entirety and in view of all the facts and circumstances under which the provisions of the will were *758 framed” (Matter of Fabbri, 2 NY2d 236, 240 [1957]). We must first attempt to discern testamentary intent from the four corners of the will itself, searching for a dominant purpose or plan of distribution and reading and giving effect to individual parts in relation to that purpose (Roe v Vingut, 117 NY 204 [1889]; Matter of Watson, 262 NY 284 [1933]; Matter of Debout, 35 AD2d 1067 [4th Dept 1970]). We adhere to the same settled principles in interpreting the trust agreement. And, because of the interrelation of the two documents created by the pour-over, we will view each in conjunction with the other in determining the decedent’s dispositive purposes.
The petitioner, respondents, and guardian all urge, however, that, so confused is the articulation of the testator’s intention in the two instruments, the court consider extrinsic evidence in the form of the testimony of the attorney-draftsman. We do not agree. In a number of decisions involving draftsmen’s errors, we and other courts have warned that to permit a draftsman, perhaps years after the event, to recount a testator’s oral expressions of intent is to risk allowing him to rewrite the will. Moreover, many factors, including the draftsman’s imperfect memory, his concern for his professional reputation, or his fear of legal action over perceived errors, may influence his testimony, rendering it of little utility (Matter of Campbell, 171 Misc 2d 892 [Sur Ct, Erie County 1997]; Matter of Salterini, 7 Misc 2d 497 [Sur Ct, NY County 1957]; see also, In re Powers’ Estate, 85 NYS2d 607 [Sur Ct, NY County 1948]).
The potential dangers are, we feel, particularly acute under the circumstances of the instant case. As the copyrights indicate, the documents before us, but especially the trust agreement, represent standard or generic forms. The provisions of this trust are therefore substantially similar to those of thousands of other such agreements sold to consumers by this and other “draftsmen”. As many sections of the instant trust reveal, this draftsman has made little attempt to tailor the form to the particular circumstances of the individual settlor (witness the numerous references to lineal descendants, which this unmarried, childless decedent does not have, as well as the audiotape depicting this as a husband-wife estate plan). A marketer of living trusts, who sells thousands of such “one size fits all” documents annually, may be expected to have only a limited recollection of the circumstances and intentions of each of his customers. And the careless, even reckless, manner with which the provisions of these instruments are pieced together casts serious doubt on the value of any explanation *759 that might be proffered. Accordingly, we will not entertain any testimony of the draftsman as to the decedent’s stated intentions.
The issue of whether the decedent meant to name the petitioner sole fiduciary under both instruments or to designate him and William Goldberg coexecutors and cosuccessor trustees has been rendered moot by Mr. Goldberg’s renunciation of any right to act as primary fiduciary during the pendency of this proceeding. Because many other such form documents are extant, however, this ambiguous language may be expected to give rise to future proceedings.
We turn now to a consideration of the significant construction issues identified by the guardian and remaining in contention: (1) does merger render the trust invalid; (2) are the assets meant to be held in continuing trust after the grantor’s death; (3) is the pour-over provision effective and, if not, (4) is the attempted incorporation of the trust into the will viable; and (5) did the decedent mean to exclude the respondents from any share in the estate or trust.
MERGER
As a self-trusteed revocable living trust that terminates on its creator’s death, the instrument before us is an example of a type of will substitute widely promoted in many States, the effectiveness of which in New York has been problematic because of the merger doctrine. The respondents argue that because, according to the terms of the trust agreement, the decedent was the sole lifetime trustee and beneficiary, the legal and beneficial interests merge in him, which terminates the trust. They then urge that because there is no valid trust to govern the disposition of assets on the decedent’s death, the trust corpus passes according to the will. And, because estate assets cannot pour into a failed trust, and because the trust’s terms cannot be incorporated into the will, the decedent’s entire estate must be distributed to them by intestacy. Both the petitioner and the guardian ad litem take issue with such an argument, contending that any merger of interests does not wholly invalidate the trust and that its dispositive provisions must govern the distribution of the decedent’s property.
Prior to its recent amendment, which took effect during the pendency of this proceeding, EPTL 7-1.1 provided that “[e]very person who by virtue of any disposition is entitled to the actual possession of property and the receipt of income therefrom has a legal estate in such property of the same quality and dura *760 tion and subject to the same conditions as his beneficial interest.” As of June 25, 1997, EPTL 7-1.1 was amended to provide that a trust is not merged or invalid because a person, including its creator, is or may become sole trustee and sole holder of the present beneficial interest, as long as one or more other persons have a beneficial interest in the trust. We recognize that there is at present uncertainty over the applicability of the new EPTL 7-1.1 to trusts such as the instant one, created before its effective date (for conflicting opinions, see, Carp and Draper, Newly Enacted Laws Dealing with Lifetime Trusts: An Analysis, 70 [No. 2] NY St B J 26-30 [Feb. 1998]; Schumacher, A Closer Look — New Lifetime Trust Legislation Contains Important Changes, NY St Bar Assn, State Bar News, Nov./ Dec. 1997, at 5). One court has recently determined the amended section’s effect to be retroactive and held it applicable to testamentary as well as living trusts (Matter of Hertzel, 174 Misc 2d 497 [Sur Ct, NY County 1997]).
The instant trust was established well before the effective date of the amended EPTL 7-1.1. We accordingly review its terms in light of the earlier version of the statute. EPTL 7-1.1 and 7-1.2, which executes passive trusts, represent New York’s version of the Statute of Uses. Courts have interpreted these sections to mean that if the same individual is the sole trustee and the sole beneficiary, there is a merger of the legal and equitable interests (usually segregated in a trust) into a fee simple. The attempted trust is therefore wholly ineffective (Greene v Greene, 125 NY 506 [1891]). If the sole trustee is the sole income beneficiary during his lifetime, but the remainder passes to another on his death, the merger, which occasions the termination of the trust, results in a legal life estate in the trustee/income beneficiary, followed by a remainder interest (Rose v Hatch, 125 NY 427 [1891]; Matter of Kagan, 118 Misc 2d 1084 [Sur Ct, Bronx County 1983]; Matter of Berman, 33 Misc 2d 1038 [Sur Ct, Kings County 1962]; In re Schlesinger’s Will, 113 NYS2d 805 [Sur Ct, Westchester County 1952]). Under such circumstances, the fact that the legal interest and the equitable interest vest in the same person does not mean that the income beneficiary receives the principal free of the trust, in fee simple absolute (Matter of Seidman, 88 Misc 2d 462 [Sur Ct, Kings County 1976]). As the Seidman court explained, pursuant to EPTL 7-1.1, the income beneficiary receives a legal interest of the same quality and duration as his beneficial interest, which is to say, his equitable interest is converted into its legal equivalent, a legal life estate in the *761 principal. All future estates, however, remain intact. Upon the death of the life tenant, the principal must be paid to the remainderman (Matter of Seidman, supra, at 468, citing Losey v Stanley, 147 NY 560, 568 [1895]).
The trust agreement now before us provides that the settlor as trustee is to pay himself as beneficiary so much of the income and principal as he himself should direct, and that the petitioner as successor trustee is to distribute the remaining corpus to himself on the settlor’s death. Thus, though the settlor was the trust’s sole trustee and sole lifetime beneficiary, he did not possess the fee simple. There is a successive and different beneficiary (the petitioner) who receives the assets on the settlor’s death, assuming that the settlor had not entirely expended them or revoked the trust during his lifetime. We cannot agree with the respondents’ contention that merger renders the entire trust invalid. We must give effect to the separable property interest (remainder interest) in the petitioner, as it is set forth and conditioned by the terms of the instrument. Accordingly, we find that it was the decedent’s intention to dispose of the assets which he transferred into his own name as trustee during his lifetime, after the expiration of his own interest, to the petitioner, subject to the terms, including the provisions for payment of taxes and expenses, of the trust instrument. We will consider the collateral issue of whether the merger precludes the trust’s receipt of assets from the estate via the will later in this decision.
DISPOSITION AT THE SETTLOR’S DEATH
Article eight, which provides for the disposition of the trust assets on the settlor’s death, is marked by inconsistencies which obscure his intention. Section 1 requires the division of trust property into separate shares. Section 2 at first provides for the distribution of all of the accumulated net income of such share to the petitioner “free of the trust” and then, with some redundancy, for the distribution of all accumulated net income and principal, “free of the trust”, again to the petitioner. But a subsequent paragraph directs that, if the beneficiary should die before the complete distribution of the trust share, the trust terminates and the trustee is to distribute the balance of the trust property to the beneficiary’s then living descendants per stirpes, or if he has none, to the settlor’s then living descendants, or if he has none, as provided in subsequent articles. Section 3 unaccountably and irrelevantly then provides for prompt distribution of all accumulated net income *762 and principal of the trust share set aside for each of the settlor’s deceased children to their descendants, despite the fact that the settlor has no descendants.
The first several sections of article eight seem to describe the outright distribution of a vested remainder. The language of subparagraph 3 of section 2, however, potentially suspends such vesting until some unspecified point in time (the complete distribution of the trust share). The full and complete merger of interests in the petitioner (trustee, income and principal beneficiary) at the settlor’s death, however, vests the fee in the petitioner free of any trust. We believe that this decedent had in mind a very simple dispositive scheme for his assets before he purchased the documents in question: their distribution to his friend at his death. Accordingly, we interpret “complete distribution of the trust share” as referring to the settlor’s date of death, the time at which the remainder is distributable. We therefore read article eight as an attempt to bequeath trust assets outright to the petitioner, made convoluted and confusing by the draftsman’s reliance on a “one size fits all” form that commonly provides for further trusts on the death of the settlor (for instance, marital and family trusts on the death of the first spouse in a husband-wife estate plan or a common “pot” trust for children after both spouses’ deaths, as outlined on the audiotape accompanying the estate planning notebook).
Accordingly, we construe article eight to reflect the decedent’s intention that upon his death, the balance of trust principal remaining after the payment of taxes and expenses is to be distributed outright to the petitioner, with such remainder to pass to the petitioner’s descendants only in the event he had not survived the settlor.
THE POUR-OVER
Although we have construed the trust to give effect to the distribution of the remainder interest to the petitioner, we find the disposition to the trust of the estate assets to be ineffective for a number of compelling reasons. EPTL 3-3.7, which codifies one of several exceptions to New York’s general proscription of incorporation by reference, permits a pour-over to a living trust only so long as the trust meets certain specified requirements. Subdivision (a) of the statute provides that, to be a valid receptacle for a pour-over, the trust must be “executed and acknowledged by the parties thereto in the manner required by the laws of this state for the recording of a conveyance of real property, prior to or contemporaneously with the execution of *763 the will, and * * * is identified in such will.” EPTL 3-3.7 (b) (1) permits a disposition to an amendable or revocable trust to be given effect “in accordance with the terms of the trust instrument, including an amendment thereto, as they appear in writing on the date of the testator’s death and, where the testator so directs, including amendments to the trust instrument after his death, if the instrument evidencing such amendment is executed and acknowledged in the manner herein provided for executing and acknowledging the instrument which it amends.” The instant trust cannot meet these standards.
The petitioner’s submissions to the court include a copy of a letter to the decedent from the “Trust Coordinator” in the office of the attorney-draftsman. The letter encloses a number of loose pages, each having three holes punched in its left margin, which it represents to be a “new Article Eight”, and it instructs that they be inserted into the trust looseleaf in place of existing sheets. Four loose pages, which are neither signed, nor acknowledged, nor dated, and which are not specifically identified in the letter, were apparently found with or near the loose-leaf, but not contained within it, at the decedent’s death. The attorney for the estate (who is not the instrument’s draftsman), assuming them to constitute the amendment to article eight, substituted them for four pages already in the notebook. These allegedly new pages provide for distribution of trust assets 99.75% to the petitioner and .25% to Marvin Raskin, whereas the other set of loose pages directs distribution of 100% of the trust assets to the petitioner.
A trust agreement is typically and properly amended by a separate written instrument, signed, dated, and acknowledged by the settlor, which, by its terms, revokes a clearly defined section of the original and sets forth new language to be substituted therefor. (Indeed, new EPTL 7-1.17 [b] imposes such requirements for amendment on trusts created after December 25, 1997.) A trust amended in such a way would be in compliance with EPTL 3-3.7 and hence a proper receptacle for a pour-over. The guardian ad litem rightly expresses horror at the attempt by this draftsman to amend the most significant provision of the instant trust, which affects the disposition of almost $1 million worth of property, by the substitution of one set of loose pages for another. The implications of such a process are numerous and disturbing; not the least of them is the potential for, indeed the invitation to, fraud or mistake. Here, the attorney for the estate assumed that the loose pages found near the notebook represented the intended alteration to the *764 trust. It may as easily be assumed, however, that the found pages represent the originals, set aside, though not discarded, when the decedent himself made the instructed insertion. And, even if the attorney were right in concluding that the decedent had not inserted the amended pages, that failure might well be a reflection of his intent not to make the change.
The will’s language calls for the distribution of estate assets to the living trust “and any amendments thereto.” It is, we find, impossible to be sure which pages represent the amendment and which the original article eight, since the accompanying letter in no way describes the pages constituting the amendment and since the original unamended trust is itself a collection of loose pages with no sheets identifiable as having existed on the date of execution. For the reasons we have articulated previously, we decline to entertain any testimony from the draftsman or his “Trust Coordinator” concerning the attempted amendment of the agreement.
We recognize that, under the peculiar circumstances of the matter before us, to refuse to give effect to the pour-over to the trust as amended is to refuse to allow the pour-over at all. We believe that important considerations of public policy mandate such a result. EPTL 3-3.7 imposes more stringent standards for a trust which receives testamentary assets than New York law, at least prior to the enactment of EPTL 7-1.14 through 7-1.18, requires of a stand-alone living trust. Such stringency is an absolute necessity in a pour-over situation. The probate system developed over the centuries to insure stability and certainty in the transfer of wealth' at death. Even in the absence of objection, a pour-over will must be proved to a court’s satisfaction to have been executed in accordance with the proper formalities by a testator possessed of the requisite capacity and free from undue influence. To put the will to such a test and then to permit the estate assets it distributes to pass to a trust, the dispositive terms of which (or even the pages on which they are set forth) cannot with certainty be identified, is wholly to undercut such safeguards and undermine the system. We believe that the court must extend the same scrutiny required by SCPA 1408 of wills to living trusts that receive testamentary assets by pour-over.
We are not satisfied with the genuineness of the trust or the validity of its execution, insofar as it functions as the recipient of estate assets. We are extremely perturbed by the looseleaf nature of this instrument, which permits the free removal and substitution of pages, making it impossible to determine *765 whether and how often the trust may have been altered, which pages constitute the instrument as originally signed, which existed on date of death, and which may have been added after death. This looseleaf format prevents the subject trust’s compliance with the signature and acknowledgment requirements of EPTL 3-3.7. At the back of the trust pages in the notebook is a sheet containing the decedent’s signatures as settlor and trustee. The acknowledgment of those signatures is found on the succeeding page, despite there being ample room for the acknowledgments on the signature page. Because neither the signature page nor the acknowledgment page is bound or securely fastened to the other pages in the notebook, we cannot be sure which pages constitute the trust as executed and acknowledged by the decedent.
We are also extremely troubled by the operation of the merger doctrine on the continued existence of this trust and its eligibility as a pour-over receptacle. Most of the early cases dealing with merger (see, discussion, supra) held that the merger of interests in the life beneficiary caused the trust to fail, leaving a legal life estate and á legal remainder. Underlying such determinations is the conceptualization of the remainder as a legal interest to take effect after the termination of the trust rather than as an equitable interest under the trust itself. According to this reasoning, because the trust’s only beneficiary was the life beneficiary/trustee, the trust ceased to exist (13 Warren’s Heaton, Surrogates’ Courts § 209.02 [1] [b] [6th ed]). But later courts recognized the problems inherent in the life estate/remainder arrangement, in particular the issue of adequate protection for the interests of the remaindermen during the life estate and sought to promote continuation of the trusts. The Court of Appeals in Matter of Phipps (2 NY2d 105 [1956]) held that if the governing instrument evidenced any intention that the trust should continue, such as the designation of a successor trustee, the Court would appoint the denominated successor a cotrustee with the life beneficiary to forestall the merger and the termination.
Other decisions appear to treat a merged trust as merely suspended during the lifetime of the sole trustee/sole income beneficiary: “[D]uring the period of the merger the trust is not wholly destroyed but merely suspended, and upon the death of the [life beneficiary] it is revived, at which time the obligation of distribution falls upon her personal representatives. Final distribution upon the termination of the trust is as much a part of the duties of a trustee as the administration of the fund *766 prior to the arrival of such time” (Matter of Lott, 148 Misc 1, 4 [Sur Ct, Queens County 1933]). Matter of Sackler (145 Misc 2d 950 [Sur Ct, Nassau County 1989]) is often cited to support the contention that a merged and suspended revocable living trust can spring back up on the life tenant’s death to become a proper receptacle for a pour-over (see, Schumacher, Sole Beneficiary I Sole Trustee: New York’s Merger Doctrine, NY St Bar Assn, Trusts and Estates Law Section Newsletter, summer 1993, at 4-9). The trust in that case, however, did not actually involve a merger, since individuals in addition to the life beneficiary/ trustee held present interests, and the notion of a continuing trust after the termination of the first estate was articulated in dictum. Nevertheless, Sackler is indicative of a judicial inclination, now codified in the amended EPTL 7-1.1, to mitigate the effects of merger on a trust’s viability, particularly at the death of the settlor, if possible. And indeed, in Matter of Howard (supra), we found that the trust, even if merged or suspended during the settlor’s lifetime, came back to life on his death to become an appropriate receptacle for the pour-over. The estate and trust assets could then be distributed by the successor trustee to the decedent’s daughters and nieces and nephews.
The instant case is distinguishable from Howard (supra) by its particular, and peculiar, set of facts. Here the settlor was sole trustee and lifetime beneficiary. On his death, the petitioner became sole trustee and beneficiary. Thus, we are prevented from treating the trust, merged or suspended during Harold Pozarnos lifetime, as springing up again on his death, by a second merger. The petitioner, as sole trustee and holder of the sole interest in the remainder, takes the corpus in fee simple absolute. The trust can be said either to fail or to terminate a second time or, what is more likely, never to have been effective. Moreover, even the amended EPTL 7-1.1, assuming arguendo it were retroactive and applicable to this case, would not forestall the second merger, since it presupposes the existence (not found here) of another beneficial interest, either present or future. This second merger vests the fee in the petitioner, such that no trust exists at the settlor’s death to receive probate assets via the pour-over.
Finally, we suspect that the language of the will itself causes the pour-over to fail and requires distribution of the probate estate pursuant to the alternative provision for incorporation by reference, which, as we discuss below, is itself highly problematic. Article three, § 2 qualifies the disposition of estate assets to the trust under the preceding section as follows: “If *767 my revocable living trust is not in effect for any reason, I give all of my property to my Personal Representative under this will as Trustee who shall hold, administer and distribute my property as a testamentary trust, the provisions of which are identical to those of my revocable living trust on the date of execution of my will.” (Emphasis added.)
This language is extremely broad and does not limit the potential inefficacy to any particular time. Under the pre-1997 EPTL 7-1.1, the trust can be seen as not in effect, because merged or suspended, during settlor’s lifetime. Similarly, it was not in effect at his death, when the actual distribution pursuant to this section would occur, because of the second merger of legal and equitable interests in the petitioner. Finally, the trust can be said not to have been in effect at the settlor’s death because, by its own terms, it terminates at that point.
Accordingly, we find that the instant trust is not a valid receptacle to receive the pour-over of assets from the decedent’s estate, and we determine that the provision under article three, § 1 of the will distributing the decedent’s probate estate to the trust cannot be given effect.
INCORPORATION BY REFERENCE
The petitioner urges that in the event of the failure of the pour-over, the court should look to the alternate disposition and permit the incorporation of the trust’s terms by reference into the will. By its own terms, article three, § 2 of the will (quoted supra) is problematic, since, as we have earlier noted, it is not possible to identify with any assurance the terms of the trust on the date of the will’s execution. Moreover, although some States permit incorporation by reference, historically New York has not. For over a century, New York courts have refused to incorporate by reference an “unattested paper which is of testamentary nature” (Booth v Baptist Church of Christ, 126 NY 215, 247 [1891]). In order to avoid frustrating the ascertained intentions of testators, however, judicial decisions have carved out some limited exceptions to the rule. Thus, the Court of Appeals permitted the incorporation by reference into a decedent’s will of provisions of his wife’s will that had been executed at the same time. In that decision Judge Cardozo described the general New York prohibition as a “safeguard against fraud and mistake”, but found, in the situation before the Court, no opportunity for either (Matter of Fowles, 222 NY 222, 232 [1918]). Another such exception, *768 which upheld the payment of a portion of a decedent’s estate into an irrevocable and nonamendable trust he had previously established for his daughter (Matter of Rausch, 258 NY 327 [1932]), was codified in EPTL 3-3.7. That section now sets forth the exclusive means by which estate assets can be distributed according to the terms of a separate trust which is amendable and has been amended. Applying the standards set forth in the earlier decisional law and in the statute, then, we cannot give effect to the incorporation.
The public policies underlying the general rule against incorporation, which have been articulated in Fowles (supra) and other decisions, are of paramount importance under the circumstances now before this court. Given the looseleaf nature of the trust instrument, and the ease with which pages can be removed and others substituted, we cannot exclude “the possibility of alteration, chicanery, fraud or mistake” (In re Snyder's Will, 125 NYS2d 459, 463 [Sur Ct, Westchester County 1953], appeal dismissed 134 NYS2d 174 [3d Dept 1954]). The instant case, to the extent that we are aware, has been characterized by mistake — on the part of the draftsman in piecing together provisions from his generic and omnibus form in ways that render substantial portions of the documents inconsistent, irrelevant, unintelligible, or erroneous; the decedent, either in failing to insert the new pages into the notebook, or in making the insertion but retaining the old pages; the estate’s attorney, in making the assumption, however well-meaning, that the loose pages found with the letter constituted the amendment and in taking it upon himself to substitute them for those already in the notebook.
But more deliberate and deleterious interference with the integrity of such an instrument is well within the realm of possibility, in this and other cases. An inadvertent or calculated removal of pages could cause the failure of the intended distributive scheme and result in intestacy. Indeed, this notebook contains a duplicate trust, minus the pages articulating its dis-positive provisions, which has also been signed and could, under certain circumstances, be deliberately substituted or unwittingly mistaken for the “original”. Advances in computer, scanner, and laser printer technology allow the replication of type styles and sizes and the creation of substitute pages indistinguishable in form from the originals, making alterations to a document undetectable. Thus it is all too easy for an unscrupulous, would-be beneficiary, having access to such a looseleaf trust, perhaps on the settlor’s hospitalization or at *769 death, to produce and substitute pages, changing a decedent’s estate plan.
To insure the certainty and security of our system of wealth transfer at death, we cannot permit the incorporation by reference of an unattested document consisting of loose pages in the absence of safeguards that assure the integrity, authenticity, and validity of that document. Accordingly, we decline to give effect to the incorporation.
PURPORTED EXCLUSION OF RESPONDENTS
Although the dispositive provisions of the will cannot be given effect, we must nevertheless admit the instrument to probate in the absence of objection (Matter of Davis, 182 NY 468 [1905]). There has been no assertion that it was other than duly and freely executed or that the decedent lacked capacity. The probate assets must accordingly pass under the will to the decedent’s intestate distributees.
In article one, § 6 of the will, however, the decedent appears to exclude the respondent distributees from any share in his estate. After acknowledging their existence, he states that he has “intentionally and with full knowledge chosen not to provide for them or their descendants, under the terms of this trust agreement, except as they may be provided for under the provisions oí Article Twelve” (emphasis supplied). The respondents urge that because by its own terms this provision refers to the trust agreement, not the will, and to an article not even found in the will, it cannot be considered a valid portion of the will.
We are troubled by the fact that this section does indeed appear to be lifted verbatim from the trust agreement and simply inserted, without even the change of section number (this section 6 directly follows section 2), and without other appropriate alterations, into the will. These anomalies at first lead one to question whether it might have been added at some point subsequent to the will’s execution. It is doubtful, however, that someone attempting to counterfeit the decedent’s intentions would have been so careless as to misnumber the provision, to designate the will as a trust, or to refer to article twelve of an instrument comprised of but five sections. Carelessness, has, however, characterized every attempt of this draftsman to make his own modifications to the will and trust forms. Here, he apparently inserted into the will a section from article one of the trust. He has also picked up the trust’s own erroneous designation of a provision for a fallback distribution to intestate *770 distributees as article twelve, when in fact that section contains no dispositive language whatsoever.
Because of the ineffective pour-over to the trust, the terms of section 6 of the will now must have a significant effect on the distribution of the probate assets, which amount to some $50,000-$60,000. An examination of the trust instrument reveals that article nine, rather than twelve, appears to be the section to which the decedent means to allude (article twelve, as the audiotape allegedly explaining the decedent’s estate plan notes, is the corresponding “catch-all” provision in the generic form husband-wife trust). Article nine of the instant trust provides that if, at any time before the full distribution of the corpus, all the designated beneficiaries are deceased and no other disposition is directed by the agreement, “all of the remaining portion of the trust estate shall be then distributed to those persons who would be my heirs had I died intestate owning such property.” The next paragraph refers specifically to New York’s law of intestate succession.
Article one, § 6, therefore, by its own terms, excludes the respondents only as primary beneficiaries. If the decedent’s assets cannot be distributed in accordance with earlier provisions of the trust, then and only then will they pass to the respondents as intestate distributees. But the will itself contains no such provision as article nine, and we decline, for reasons already stated, to incorporate any section of the trust by reference.
We find this provision, ultimately, too fraught with errors, too problematic to be given effect as part of the will. We note, however, that if we were to overlook the numerous misstatements that characterize its articulation, and read it together with article nine of the trust, we could at least discern an intention on the part of the decedent not to benefit the respondents or their descendants except under certain remote circumstances. That is, if other dispositions have failed, he would rather leave his estate to the respondents than have it escheat. That is the very possibility we now confront. Therefore, whether we disregard this provision entirely, or view it, along with portions of the trust to which it alludes, as reflective of intent, we find that the respondents are not barred from sharing in the estate under the instant circumstances. Accordingly, we hold that the assets titled in the decedent’s name at death pass to the respondents in equal shares upon the will’s admission to probate.
Harold Pozarny’s intention regarding the disposition of his assets at death was entirely straightforward and simple. The *771 trust instrument and pour-over will he purchased, however, in their dependence on generic forms that failed to take account of the peculiarities of New York law (particularly the merger doctrine, which was in effect at the time the trust was executed and when its creator died, and the general prohibition against incorporation by reference), their looseleaf format, and their numerous ambiguities, errors, and inconsistencies, placed that dispositive scheme at grave risk. This decedent would have been better served by a simple will.
The instant case points up numerous problems involving living trusts (in particular, the different standards by which the validity of a pour-over will and its receptacle trust are evaluated and the widespread use of looseleaf trusts). Enactment of legislation such as that recently passed in Florida, requiring that trusts be executed with all the formalities of wills, or the extension to receptacle trusts of the SCPA 1408 provision for independent court scrutiny of the instrument’s genuineness would provide essential safeguards for the citizens of this State.
Wherefore, we hold as follows: that the merger of the trust’s legal and equitable interests in Harold Pozarny during his lifetime does not render the petitioner’s remainder interest invalid and that assets held in the trust as of date of death pass outright to the petitioner, after the payment of taxes and other expenses; that the disposition of estate assets to the trust pursuant to article three, § 1 of the will cannot be given effect, since the trust is not a valid receptacle for the pour-over; that the provision under article three, § 2 of the will for incorporation of the trust’s terms by reference into the will cannot be given effect and that accordingly the estate assets pass under the will, in the absence of objections to its probate, to the respondents as the decedent’s intestate distributees.